IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JERIMEY LAY and TABITHA LAY,
as guardian and next friend of
R.L., and C.L. and KATELYN
WEBB, on behalf of and as
guardian and Next Friend of K.S.
and D.S. and all Others Similarly
Situated, and themselves and all
Others Similarly Situated

PLAINTIFFS

VS.   CASE NO: **4:17-CV-00660-JLH**

CHELSEA SMITH, Individually
and in her Official Capacity;
STACY HOUCK, Individually and
in her Official Capacity; MISCHA
MARTIN, individually and in her
official capacity; CINDY
GILLESPIE, individually and in her
official capacity

DEFENDANTS

## FIRST AMENDED CLASS ACTION COMPLAINT

COMES each PLAINTIFF, by and through Counsel and for this CLASS ACTION Complaint states:

### PARTIES AND JURISDICTION

1. KATELYN WEBB is a resident and citizen of the State of Arkansas, whose children were seized by Chelsea Smith, a Family Services Worker for Division of Child and Family Services, a division the Department of Human Services, in Grant County, Arkansas in 2017. Jerimey and Tabitha Lay are married residents and citizens of the State of Arkansas, whose three children were seized by Stacy Houck, a Family Services Worker for Division of Children and Family Services, a division the Department of Human Services in White County, Arkansas in 2017. Mischa Martin is sued in her individual and official capacity as the Director of Division of Child and Family Services, which is a division of the Department of Human Services. Cindy Gillespie is sued in her individual and official capacity as the Director of the Department of

Human Services. Stacy Houck is sued in her official capacity as a Family Services Worker for the Department of Human Services, as well as her individual capacity, for her failure to provide the Lays and their children with a prompt post-deprivation hearing, for deprivation of their First Amendment right to association, for depriving them of their Fourteenth Amendment substantive and procedural due process rights, and for violating the minor children's Fourth Amendment right to be free from unreasonable seizure. Chelsea Smith is sued in her official capacity as a Family Services Worker for the Department of Human Services, as well as her individual capacity, for her failure to provide Webb and her children with a prompt post-deprivation hearing, for deprivation of their First Amendment right to association, for depriving them of their Fourteenth Amendment substantive and procedural due process rights, and for violating the minor children's Fourth Amendment right to be free from unreasonable seizure. Mischa Martin and Cindy Gillespie are sued in their official capacity for Declaratory and Injunctive relief under Ex Parte Young 209 U.S. 123 28 S.Ct. 441 (3/23/1908) U.S. Minn. Plaintiff also sues for Declaratory Judgment. Each Plaintiff brings 4th Amendment claims on behalf of their minor children. Accordingly, this Court has federal question subject matter jurisdiction under 28 U.S.C. §1331, as well as supplemental jurisdiction over Plaintiff's state claims under 28 U.S.C. §1367. Venue is proper under 28 U.S.C. §1391. All actions were taken under color of state law.

## GENERAL ALLEGATIONS OF FACTS

**WEBB FAMILY**

2. Plaintiff, Katelyn Webb is a fit mother of two children who were wrongfully seized by Chelsea Smith.

3. On Wednesday June 28th, 2017, Juvenile Judge Chris Williams jailed Katelyn for 5 days, for contempt and the children were seized because Plaintiff was jailed.

4. On Monday, July 3rd, 2017, Webb was released from jail upon completion of her sentence.

5.    Two days after Webb's release, on July, 5, 2017, Defendant Smith caused to be filed an Emergency Petition falsely alleging that Katelyn was incarcerated and that no appropriate relative or friend was willing or able to provide or care for the children.

6.    On Wednesday, July 5th, 2017, Judge Williams, based upon the false allegations, entered an Ex-Parte order of custody 7 days post-seizure, which is 4 days past the 72 hour statutory limitation set-forth in

A.C.A. § 12-18-1001. **Protective custody generally.**

(b) However, custody shall not exceed seventy-two (72) hours except in the event that the expiration of seventy-two (72) hours falls on a weekend or holiday, in which case custody may be extended to the end of the next business day following the weekend or holiday.

And;

The same order set Webb's initial hearing post-seizure (the probable cause hearing) for July 12th (7 days post Ex-Parte Order, and 14 days post-seizure)

7.    A.C.A. §9-27-314 (b) states: The emergency order shall include:

(1)    Notice to all defendants and respondents named in the petition of the right to a hearing and that a hearing will be held within five (5) business days of the issuance of the ex parte order;

8.    Allowing five days to be heard after one's property is seized is unconstitutional, and each Plaintiff seeks Declaratory Judgment that the statute is unconstitutional because it fails to provide for a prompt post-deprivation hearing after children are seized and removed from the care and control of their parents, and in nearly every case, that parent is denied even the most basic information including the child's whereabouts or in whose care he or she is, until that initial appearance (probable cause hearing).

9.    Nonetheless, even this hearing (July 12th) was cancelled by a text from caseworker Chelsea Smith:



10. Thereafter the Probable Cause hearing was reset by the court to July 20th without any consultation with the Plaintiff. Defendant took no steps to obtain a timely hearing. In fact, Defendants Smith and Houck routinely relied upon a will call policy, where she simply waited for the Court to schedule hearings, similar to the policy held unconstitutional in Hayes v. Faulkner County.

> "...policy involved sheriff's office submitting names of those confined in jail to court and then waiting for court to schedule hearing, which improperly delegated the responsibility of bringing arrestees promptly to court for first appearance, and ignored the lack of authority for long-term confinement. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983. <u>Hayes V. Faulkner County, Ark</u>. 388 F. 3d 66910/29/2004C.A.8 (Ark.)

11. Plaintiff Webb appeared, and Judge Williams intended to appoint Parent Counsel, Gregory Crain as her lawyer, but Plaintiff Webb advised the Court that she had spoken to a lawyer and did not want Parent Counsel appointed to her case.

12. Judge Williams continued the hearing again and setting it for July 26th.

13. On July 26th, Judge Williams found that probable cause had existed at the time of removal, but did not adjudicate the children dependent neglected, finding no need for a dependency case to continue. Immediately, custody of the kids was restored to the Plaintiff.

14. Judge Williams ordered a protective services case opened, but no services were provided because none were needed. So, Plaintiff Webb and her minor children were quickly dismissed from court oversight. Had the hearing been held timely, Plaintiff Webb's children would have been returned to her weeks earlier. Thus, Plaintiff was deprived of custody of her children, and deprived of familial association; while the children suffered loss of familial association as well as unnecessary and unlawful seizure.

15. Had Defendant Martin performed her duties competently, rather than knowingly allowing DCFS policies to violate substantive and procedural due process of families, Smith would have had to provide for a timely hearing, and Plaintiff would not have been deprived of her relationship with her children for more than the 5 days of her incarceration.

**LAY FAMILY**

16. Plaintiffs, Jerimey and Tabitha Lay are fit parents who have been married for nineteen years, and have three children who were wrongfully seized by Stacy Houck.

17. Houck seized the three Lay children on May 1, 2017.

18. Houck filed an ex-parte motion for custody on May 3, 2017.

19. The Court entered Ex-parte order of custody May 5, 2017 setting PC hearing for May 8, 2017 for the Lay's initial post-deprivation hearing (probable cause hearing).

20. On May 8th (7 days post-seizure), the probable cause hearing began. Counsel for Lays objected to the timeliness of the hearing and alleged that the setting was in violation of the family's due process rights. The trial court stated that it was within the statutory timeframe and no derogation had occurred. Yet this hearing was not concluded on May 8th, and upon demand of the Ad Litem, (an arm of or extension of the court) the children were ordered to remain seized

until May 10th to obtain a 3rd interrogation by CAC) Children were ordered to be returned to the mother (with safety plan) on Wednesday the 10th unless ad litem objected.

21.   The attorney ad litem objected, (by email, with no new supporting fact or evidence offered) therefore, on the 10th of May, 2017, the Court set the conclusion of the PC hearing for Friday May 12, 2017.

22.   At the conclusion of the May 12th PC hearing, which was 11 days post-seizure, the three Lay children were allowed to return home with the mother under a safety plan, which required the Lays to keep agency apprised at all times where children are, inability to move them without permission – even to grandma's house to visit, and Mr. Lay could have no contact and must reside outside the home.  These actions substantially interfered with the Lays right of association and their right to parent, and with their right to reside together as husband and wife.

23.   DCFS has an unwritten yet pervasive policy of requiring many parents to separate from each other upon often spurious accusations and fabricated evidence, which places extreme financial and logistic hardships on the parents and all but guarantees failure to adequately complete the "case plan" for reunification. In fact, even financially solvent, highly functioning families, would have difficulty meeting the demands that nearly every "case plan" puts on families under the jurisdiction of juvenile courts in dependency cases.

24.   As matter of official policy or custom, Defendants Smith and Houck, with Ms. Martin and Gillespie's approval and ratification, routinely seized Arkansas and American Citizens' children and held them for more than 72 hours without making sure the Court is notified, and without commencing proceedings by obeying A.C.A. § 9-27-310 in a timely manner. In fact, in Webb's case, proceedings were not "commenced" (with a false sworn statement) until the two days after Plaintiff was released from jail, which was the sole reason for the seizure.

25.   Indeed, in most cases, Ms. Martin and Ms. Gillespie do not even require hearings to be scheduled within 5 days, in accordance with the herein challenged Arkansas state law. In

the absence of injunctive relief, she will continue to seize Arkansas children and confine them away from their families for more than 5 days without a timely post-deprivation hearing. These violations occur daily to hundreds of individuals, however, due to the short length of time involved, are continually of repeated yet evade review.

26. Untold thousands of citizens and their children have been subjected to this practice within the past three years. Due process requires a prompt post-deprivation hearing. Swipies v. Kofka, 419 F.3d 709, 2005 U.S. App. LEXIS 16861

27. Despite clear and abundant warnings, Martin and Gillespie each refuses to dutifully ensure that Arkansas and American Citizens receive a prompt judicial appearance, after their agency seizes children, in effect creating a Star Chamber with jurisdiction to violate a citizen's inalienable rights the instant he or she becomes a parent.

28. Defendants are responsible for ensuring citizens like the Plaintiffs herein receive a prompt judicial appearance, post-deprivation.

29. However, the policy, custom, and training of DHS, directs Defendants to do exactly what happened in this case. See Transcript of hearing Lay Probable Cause Hearing attached as Exhibit "A."

30. Timely hearings would have prevented the extended and unnecessary infringement on Plaintiffs' familial rights.

**COUNT I- CLASS ALLEGATIONS**

31. Each Plaintiff realleges the foregoing against Defendants in their official capacity as if fully set out herein.

32. Each Plaintiff and the Class are guaranteed due process of law pursuant to the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, sec. 1. Each Plaintiff and the Class bring claims for violations of both substantive and procedural due process.

33. Substantive due process rights are those rights which are "fundamental" under the Constitution. The United States Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child" protected by the Fourteenth Amendment. Troxel V. Granville 530 U. S. 57120 S. Ct. 20542000 WL 712807 6/5/2000 U.S.Wash. See also Miller v. City of Philadelphia, 174 F.3d 368, 374 (3d Cir. 1999) (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599, 606 (1982)).

34. "The touchstone of due process is the protection of the individual against arbitrary action of government." Miller, 174 F.3d at 374 (internal quotations omitted). To incur liability, the objective character of the government action must be so egregious that it "shocks the conscience". Miller, 174 F.3d at 375.

35. To state a Section 1983 claim for deprivation of procedural due process, plaintiff must allege that: (1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) the procedures available did not provide due process of law. Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). Regarding the first requirement, as discussed above, parents have a constitutionally cognizable liberty interest in the care, custody, and management of their children. Miller, 174 F.3d at 374. The Fourteenth Amendment's Due Process Clause has a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests," Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772, including parents' fundamental right to make decisions concerning the care, custody, and control of their children, see, e.g., Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Pp. 2059–2060. The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the

Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in <u>Pierce</u> that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Id., at 535, 45 S.Ct. 571. We returned to the subject in <u>Prince v. Massachusetts</u>, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Id., at 166, 64 S.Ct. 438. (See <u>Troxel V. Granville,</u> 530 U. S. 57 120 S. Ct. 2054 2000 WL 712807 6/5/2000 U.S. Wash.)

Regarding the second requirement (procedures available) "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (See <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 374 (3d Cir. 1999)).

36. Each Plaintiff and the Class have been denied the opportunity to be heard at a meaningful time and in a meaningful manner, and there is no adequate remedy at law because the state statutes are unconstitutional to the extent they allow more than 72 hours for a post-deprivation hearing. Moreover, said statutes (and many others within the Arkansas Child Maltreatment Act) are routinely ignored because no penalty is codified for failure of the agencies to obey statutory requirements. Indeed, Arkansas State Courts require actual damage as well as malice.

37. Defendants and Ms. Martin in their official capacity had a duty to ensure that Plaintiff received a prompt post-deprivation hearing within 3 days. But Defendants failed. It was within Defendants power to provide each Plaintiff a prompt post-deprivation hearing, but

Defendants failed, instead relying upon an unconstitutional will call policy. The class consists of all persons involved with DCFS dependency cases; both parents whose children have been seized, and all seized children in Arkansas within three years prior to the filing of this lawsuit at the direction of Ms. Martin in her official capacity.. . The study referenced below found that 22 percent of the removals were potentially not necessary, compared to only 17 percent of those occurring in the comparison period. That translates into at least 300 additional removals which are questionable. In most of these cases, there were family supports clearly available which could have prevented the removal or the allegations were simply not sufficiently serious to warrant removal; and in rare instances, the investigative work was incomplete or there was nothing in the record to indicate any safety concern. Thus, numerocity is met.

38. Plaintiff's claims are typical of the class and there are common issues of fact These issues include, but are not limited to whether Defendants has a policy or custom that has lead to the deprivation of the state and federal constitutional rights granted the Plaintiff and the class.

39. A class action is a superior means of adjudicating this controversy. Indeed, common issues of fact and questions of law predominate over individual issues. Such actions occur in this State every day and are capable of repetition yet evading review.

40. Plaintiffs and their counsel are competent to represent the class. She seeks certification under Rule 23 (b)(1), (b)(2), and (b)(3), as the evidence may allow.

41. Each Plaintiff seeks a per diem on behalf of themselves and the Class, as well, against the Defendants.

42. Plaintiff seeks Declaratory Judgement that any statute that allows more than three days for a post-seizure hearing and allows for less than a clear and convincing standard is unconstitutional.

43. Plaintiff seeks appropriate injunctive relief requiring Ms. Martin and her agency to provide Plaintiff and the Class Members a post-deprivation hearing within 3 days after children are seized or such time the Court deems constitutionally appropriate

## COUNT II- INDIVIDUAL RELIEF-WEBB

44. Plaintiff Webb realleges paragraphs 1-35 against Chelsea Smith as if fully set out herein.

45. Chelsea Smith (Defendant herein) is sued in her official capacity as a Family Services Worker for the Department of Human Services, as well as her individual capacity, for her failure to provide the Plaintiff with a prompt post-deprivation hearing, for deprivation of her First Amendment right to familial association, for deprivation of Plaintiff's Fourteenth Amendment substantive and procedural due process rights, and for deprivation of the children's Fourth Amendment right to be free from unreasonable seizure.

46. The law requiring a prompt post-deprivation hearing was clearly established by Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599, 1982 U.S. LEXIS 89, 50 U.S.L.W. 4333.

47. Qualified immunity applies to all public officials and must be analyzed in light of the circumstances of each particular case. Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565, 573 (2009).

48. In resolving a claim for qualified immunity, a court must decide: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. Pearson, 555 U.S. at 232, 129 S.Ct. at 815-816, 172 L.Ed.2d at 573. A court may address either of these prongs first, based on the particular circumstances of the case at hand. Pearson, 555 U.S. at 236, 129 S.Ct. at 818, 172 L.Ed.2d at 576.

49. The constitutional right at issue is "clearly established" where the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. 603, 614-615, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818, 830 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987)). A court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the official to determine whether a reasonable state actor could have believed his conduct was lawful.

50. The right to parent one's child is a fundamental right. In Brown v. Daniels, 128 Fed.Appx. 910 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit held that a post-deprivation hearing held seven weeks after the child was taken into custody, instead of 72 hours, made out a prima facie claim for a procedural due process violation. Further, the Third Circuit held that the child services caseworker was not entitled to qualified immunity because "a reasonable [children and youth services] employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process." Brown, 128 Fed.Appx. at 916. The 8th Circuit has held in a similar manner. Swipies v. Kofka, 419 F.3d 709, 2005 U.S. App. LEXIS 16861. Thus, Plaintiff had a clearly established right to parent her child and was entitled to a relationship with her children without interference by the State without reasonable suspicion that the child is endangered. It was clearly established at the time of the seizure that at least a reasonable suspicion of child abuse was required before removing children from the home. *Heartland Acad. Cmty. Church*, 427 F.3d at 534 ("This Court has determined that qualified immunity may be available for child abuse investigators who are defendants in suits for alleged violation of the right to family integrity if their actions are properly founded upon a reasonable suspicion of child abuse." (quotation omitted)). Here, Ms. Smith had no suspicion that child abuse had occurred. Thus, the filing of a false petition to establish DHS jurisdiction over the person of the child violated Plaintiff and her children's constitutional rights.

51. Defendant Smith did not have a reasonable suspicion of child abuse or neglect at the time she filed the Petition on July 5th, 2017. Therefore, Smith violated the 4th Amendment by seizing the children without cause, and Webb brings this claim against Smith on behalf of her children, as well as herself.

52. Plaintiff and her children have experienced severe mental and emotional distress such that Plaintiff pleads for appropriate compensatory and punitive damages against Defendant Smith and Martin in their individual capacities.

### COUNT III- INDIVIDUAL RELIEF-LAYS

53. The Lay Plaintiffs reallege paragraphs 1-35 against Stacy Houck as if fully set out herein.

54. Stacy Houck is sued in her official capacity as a Family Services Worker for the Department of Human Services, as well as her individual capacity, for her failure to provide the Plaintiff with a prompt post-deprivation hearing, for deprivation of her First Amendment right to familial association, for deprivation of Plaintiff's Fourteenth Amendment substantive and procedural due process rights, and for deprivation of the children's Fourth Amendment right to be free from unreasonable seizure.

55. The law requiring a prompt post-deprivation hearing was clearly established by Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599, 1982 U.S. LEXIS 89, 50 U.S.L.W. 4333.

56. Qualified immunity applies to all public officials and must be analyzed in light of the circumstances of each particular case. Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565, 573 (2009).

57. In resolving a claim for qualified immunity, a court must decide: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2)

whether the right at issue was clearly established at the time of defendant's alleged misconduct. Pearson, 555 U.S. at 232, 129 S.Ct. at 815-816, 172 L.Ed.2d at 573. A court may address either of these prongs first, based on the particular circumstances of the case at hand. Pearson, 555 U.S. at 236, 129 S.Ct. at 818, 172 L.Ed.2d at 576.

58. The constitutional right at issue is "clearly established" where the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. 603, 614-615, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818, 830 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987)). A court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the official to determine whether a reasonable state actor could have believed his conduct was lawful.

59. The right to parent one's child is a fundamental right. In Brown v. Daniels, 128 Fed.Appx. 910 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit held that a post-deprivation hearing held seven weeks after the child was taken into custody, instead of 72 hours, made out a prima facie claim for a procedural due process violation. Further, the Third Circuit held that the child services caseworker was not entitled to qualified immunity because "a reasonable [children and youth services] employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process." Brown, 128 Fed.Appx. at 916. The 8th Circuit has held in a similar manner. Swipies v. Kofka, 419 F.3d 709, 2005 U.S. App. LEXIS 16861. Thus, Plaintiff had a clearly established right to parent her child and was entitled to a relationship with her children without interference by the State without reasonable suspicion that the child is endangered. It was clearly established at the time of the seizure that at least a reasonable suspicion of child abuse was required before removing children from the home. *Heartland Acad. Cmty. Church*, 427 F.3d at 534 ("This Court has determined that qualified immunity may be available for child abuse investigators who are defendants in suits for alleged violation of the right to family

integrity if their actions are properly founded upon a reasonable suspicion of child abuse." (quotation omitted)). Here, Ms. Houck had no suspicion that child abuse had occurred. In fact, Houck claimed Ms. Lay surrendered them to her. This was false. Thus, the filing of a false petition to establish DHS jurisdiction over the person of the child violated Plaintiffs and their children's constitutional rights.

60. Defendant Houck did not have a reasonable suspicion of child abuse or neglect at the time she filed the Petition on May 3rd 2017. Therefore, Houck violated the 4th Amendment, and the Lays brings this claim against Houck on behalf of their children

61. Plaintiffs and their children have experienced severe mental and emotional distress such that Plaintiffs plead for appropriate compensatory and punitive damages against Defendant Smith and Martin in her individual capacity

## COUNT III- INDIVIDUAL RELIEF-ALL PLAINTIFFS

62. All Plaintiffs reallege the foregoing paragraphs against Defendants Martin and Gillespie in their individual and official capacity as if fully set out herein.

63. Ms. Martin is a lawyer licensed to practice in the State of Arkansas knowledgeable in child protection and the steps necessary to protect children and the constitutional rights of the both the children and affected parents. She is a policymaker. She has been intimately and personally involved in both the legislative process and oversees rules and regulations making. She knows what is happening under her and sanctions the actions.

64. Ms. Gillespie is the Director of DHS and is also knowledgeable in child protection and the steps necessary to protect children and the constitutional rights of the both the children and affected parents. She is a policymaker.

65. Since the beginning of 2015, Arkansas has seen a 30 percent increase in the number of children in foster care, fewer children exiting foster care, and a beleaguered field staff with such high turnover that most field social workers in DCFS now have just an average 1.8 years of experience on the job.

66. In 2015, there was a review of the Department's Division of Children and Family Services by Paul Vincent, director of the nonprofit Child Welfare Policy and Practice Group out of Alabama.

67. Vincent made 11 recommendations, including a reduction in workload on DCFS caseworkers. Vincent found that those workers handle on average 29 cases. The nationally recognized standard is 15. "That is a strain on the caseworkers, it leads to increased turnover, it leads to bad morale, it leads to bad decisions and bad performance," Hutchinson said at a press conference in July about Vincent's review.

68. DCFS caseworkers work with children in family homes, group homes, behavioral health care facilities and foster care when allegations of maltreatment — which can range from educational neglect to abuse — have been found to be true. When caseworkers are overburdened, children suffer. In Arkansas, in 63 of the state's 75 counties, DCFS consistently recorded in 2015, 2016, and 2017 caseloads above the recommended standard, with Hot Spring County averaging the highest — 79 per worker. Other counties where DCFS caseloads are grossly in excess of the national standard are Cross (68), Dallas (51), Saline (53) and Sevier (55). The figures come from a DCFS quarterly performance report that examines data from Jan. 1, 2015 through March 31, 2015.

69. "If I applied the kind of cases that we currently have today, and I applied the recommended caseload standards to those," DCFS Director Cecile Blucker said, "I would need a staff of 601 and 391 [purely]case-carrying staff." The 400 or so family service workers on staff now include both caseworkers and investigators. Short staffing "does impact our ability to maybe be better than we could be," she said.

70. In 2016, DCFS administrators, officials from other DHS divisions, partners with local and national nonprofits and Medicaid experts met several times a week for "war room" sessions intended to figure out what was going wrong in the state's child welfare system and how it could be stabilized. "There are so many issues going on, and they feed on each other," said DHS Director Cindy Gillespie in 2016. "What we're focused on is breaking that cycle." However, that cycle has not been broken.

71. DCFS hired Hornby Zeller Associates, Inc. (HZA) who created a report that identified a number of issues contributing to the sharp rise in the foster care population since Jan. 2015. Crucially, HZA said child abuse and neglect incidents did not substantially increase over that time period. The HZA report, which was delivered to DCFS in June of 2016, found that there had been a notable increase in "questionable removals" of children from their homes. Of 400 sample cases HZA examined, 22 percent of children who'd been taken into foster care perhaps should have been left with their families, the consultant said.

72. The report attributed the problem largely to internal divisions within DCFS, as well as the role of local courts, which are sometimes hostile to the idea of leaving children at home or with relatives.

73. In October, DCFS Director Mischa Martin said the consultant's report showed a limited picture of what was happening, and that the agency was working on its own, more comprehensive assessment of the problem, as well as its possible solutions.

74. That report, "Moving Beyond Crisis," was released in 2016 and was presented by Gillespie and Martin as the first phase of a long-term plan to stabilize and improve the child welfare system. A distillation of the "war room" sessions, the report acknowledged that with 5,200 children in foster care — a roughly 1,200-child increase from 2014 — the system is failing, lacking both "the right placement options for abused and neglected children and adequate prevention programs to help struggling families."

75. "Aside from the unprecedented growth, the problems discussed in the war room meetings are not new," the report said, "but the approaches identified to address them are new to Arkansas. These solutions are the result of having many partners — not just child welfare experts — at the table."

76. The specific goals of the stabilization team included a renewed focus on strengthening families so children can remain safely at home; improving foster care through a stronger DCFS workforce and community partnerships; and, better policies for children in need of behavioral health treatment and families in need of help with substance abuse. DCFS Director

77. Martin said one of agency's priorities was to keep children at home.

78. In recognition of the fact that children generally fare better and are less traumatized by remaining with their families, the report focused heavily on ways to preserve families. At the end of fiscal year 2016, more than 6,000 children were being monitored through what DCFS calls "in-home cases." But high caseloads and an overburdened DCFS field staff caused caseworkers to be unable to keep up with the demand to visit homes and provide support services, as well as obtain timely post-deprivation hearings.

79. In 2016, Gillespie said, the agency lacks the means of effectively helping keep children at home in situations where it may be safe to do so. "We can't get the family ready to take a child back," she said. "That's why [Director Martin's] first bucket, the Prevention and Reintegration Unit, is an incredibly important part of what we're doing. We haven't got the resources, in or out of house, to focus on a family that might be getting into trouble." This problem continues today, and Plaintiffs appropriate injunctive relief is to insure that timely post-deprivation process is given, especially where DCFS own consultant found that children were being removed unnecessarily.

80. Indeed, Defendants Gillespie and Martin were well aware that turnover rates in the agency were high in 2016 and continue to be high.

81. DHS Director Gillespie said, "the reports we get are that every month the experience [level] of our staff is going down. ... Thus, the deprivation of Plaintiffs' constitutional rights are directly caused by Defendants Gillespie and Martin's failure to train and failure to supervise an overwhelmingly inexperienced and incompetent group of individuals who have the power to remove children from their homes without warrants, and without probable cause.

82. Defendants Gillespie and Martin knew that children and their parents were entitled to a timely post-deprivation hearing and knew that that most children and their parents were not getting a timely post-deprivation hearing, in fact most aren't even within the time constraints of the state law, which is challenged as unconstitutional herein.

83. However, Defendants Gillespie and Martin took no action and ratified these caseworker's actions, thereby creating a policy and custom of depriving parent and their children of their Due Process rights, both procedural and substantive.

84. Defendants Gillespie and Martin participated directly in the alleged constitutional violations herein, (2) Defendants Gillespie and Martin, after being informed of the violations herein through the above reports, failed to remedy the wrong, (3) Defendants Gillespie and Martin created a policy or custom under which unconstitutional practices alleged herein occurred, or allowed the continuance of such a policy or custom, (4) Defendants Gillespie and Martin each was grossly negligent in supervising Smith and Houck who committed the wrongful acts, or (5) Defendants Gillespie and Martin exhibited deliberate indifference to the rights of the Plaintiffs and the Class by failing to act on information indicating that unconstitutional acts were occurring.

85. Plaintiffs and their children have experienced severe mental and emotional distress such that Plaintiff pleads for appropriate compensatory and punitive damages against Defendant Smith and Martin in their individual capacities.

WHEREFORE Plaintiffs pray for an Order certifying the class described above, for appropriate compensatory and punitive damages, for a trial by jury, for appropriate declaratory

judgment as requested above and injunctive relief requiring the Defendants to provide Plaintiff and the class with a prompt, proper, and post deprivation hearing within 72 hours of seizure or other appropriate time to be set by the Court, for reasonable attorney's fees, for costs, and for all other proper relief.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910 Office
501-315-1916 Facsimile
Attorney for the Plaintiff

By: /s/ Luther Oneal Sutter
Luther Oneal Sutter, AR Bar No. 95031
luthersutter@yahoo.com

and
/s/ Joseph E. Churchwell
Joseph Churchwell, AR Bar No. 2005057
P.O. Box 2498
Benton AR, 72018
(501)225-5563 phone
(501)315-1916 fax
churchwell.law@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing has been served on this, the 20th day of December, 2017, upon counsel for the Defendants via ECF:

Maryna Jackson

/s/ Luther Oneal Sutter
Luther Oneal Sutter