IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

Jerimey Lay and Tabitha Lay, as guardian and next friend of RL and CL and Katelyn Webb, on behalf of and as guardian Of KS and DS,

Plaintiff,

v. No. 4:17CV660-JLH

CHELSEA SMITH, individually and in her official capacity; STACY HOUCK, individually and in her official capacity; MISCHA MARTIN, individually and in her official capacity; CINDY GILLESPIE, individually and in her official capacity,

Defendant.

June 18, 2018, 2018
Little Rock, Arkansas
1:30 p.m.

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Plaintiff:
MR. JOSEPH E. CHURCHWELL, Attorney at Law
Churchwell Law Firm
214 Hobson Avenue
Hot Springs, Arkansas 71913
MR. LUCIEN RAMSEUR GILLHAM
Sutter & Gillham, PLLC
Post Office Box 2012
Benton, Arkansas 72018

On Behalf of the Defendants:
MS. MARYNA O. JACKSON, Arkansas Attorney General's Office
Catlett-Prien Tower Building
323 Center Street, Suite 200
Little Rock, Arkansas 72201-2610

Proceedings reported by machine stenography and displayed in realtime; transcript prepared utilizing computer-aided transcription.

THE COURT: Everyone be seated.

We are here in the case of Jerimey Lay and Tabitha Lay as guardian and next friend of RL and CL and Katelyn Webb on behalf of and as guardian of KS and DS against Chelsea Smith, individually and in her official capacity; Stacy Houck, individually and in her official capacity; Mischa Martin, individually and in her official capacity; Cindy Gillespie, individually and in her official capacity, Case No. 4:17-CV-660.

The Court previously granted and denied in part a motion to dismiss the first amended complaint, and the plaintiffs have filed a motion to alter or amend the order and to be permitted to amend the complaint, and we are here for argument on that motion.

Are the plaintiffs ready?

MR. GILLHAM: Yes, sir.

THE COURT: Are the defendants ready?

MS. JACKSON: Yes, sir.

THE COURT: All right. Mr. Gillham, you may proceed.

MR. GILLHAM: Your Honor, my clients are here on essentially three types of claims. One is that their rights were violated by an unconstitutional statutory scheme under the Arkansas Juvenile Code that basically permits hearings to occur after seizure without any sort of order first up to 11 to 12 days after the seizure. And we think that's an unconstitutional statutory scheme in that they pretty much have 72 hours to get a

hearing done where you have an ex parte seizure of children.

Two, we are here because regardless of the statutory scheme, DHS is routinely seizing children without an order and not getting a timely hearing to the families, to the children, to the parents for periods even extending well beyond Arkansas statutory scale.

Three, we had alleged -- and these are not nonclass claims -- that there was a seizure of the children without probable cause.

Now, a motion to dismiss had been filed, and it had been granted, to a considerable extent, dismissing the Lays entirely and the Webb claims partially, and as I understand it, the claims that survive were that Webb was suing -- Webb was being able to sue for her claims because Chelsea Smith had not timely instituted the judicial process, waiting about seven days after seizure to file anything with the Court, and then the claims against her supervisors because her conduct was considered by her and, according to the allegations of the complaint, be consistent with DHS policy, procedure, training, practice, that that sort of thing was known to go on and happened all the time.

Now, there were three reasons that I think motion to dismiss was granted in part. One was related to standing. One was related to Rooker-Feldman issues. And one was related to qualified immunity issues.

And I think there's just a few questions that need to be

answered with respect to each of these that are significant.

On standing, I think one of the questions is: Is this an issue that is cable of repetition yet avoiding review? Two is my client is alleging violation of -- my clients are alleging violation of First Amendment associational rights. And so the next question is: Where there is a potential chilling effect of First Amendment rights, is that a cognizable injury under 42 USC 1983? And three is: When you've brought a class action, are standards for standing relaxed somewhat because of that? And I think the answer to all three questions is yes.

On Rooker-Feldman the key question is: Are we engaged in a collateral attack on a final appealable order? and the answer to that, I think, is no. And the reason I say that is that, first of all, the probable cause findings were not appealable orders. In order to be a final order that you're engaged in a collateral attack on, it has to be a final appealable order. A probable cause order is not one. The second thing is that the -- these proceedings ultimately came to the end when the claims that had been brought by DHS were dismissed without prejudice.

THE COURT: All the judicial proceedings concerned are over; is that right?

MR. GILLHAM: The --

THE COURT: All the state court judicial proceedings that you're complaining about are over?

MR. GILLHAM: Yes, sir.

THE COURT: And they were over before you filed this case?

MR. GILLHAM: Yes, sir, although, with the dismissal without prejudice, I guess there is a potential they could be refiled, although I think Ms. Webb's year may have -- no. Ms. Webb's year is not over. So the year has not run on that, but other than that, yes, they would be over.

THE COURT: They were dismissed?

MR. GILLHAM: They were dismissed without prejudice.

And the thing is, under Arkansas law, you cannot appeal a dismissal without prejudice. And the other thing is -- is that my clients got their children back; They weren't convicted of abuse; They would have no reason to appeal a dismissal without prejudice. Effectively, they won.

The next thing is that, in order to come under this issue of Rooker-Feldman, it has to be a collateral attack on the order, and that's not happening here. It's not happening either before the procedural due-process issues because they are the issues that they get a timely hearing. It has nothing to do with the ultimate outcome of the hearing.

It's also not a collateral attack on that order because my clients -- it's not a situation where my clients were found to have committed child abuse or neglect and you are now trying to get around that in your court.

THE COURT: But you're alleging that the children were seized without probable cause?

MR. GILLHAM: Yes, sir.

THE COURT: That is one of the claims?

MR. GILLHAM: That is one.

THE COURT: And that issue was litigated, and there was an order in both of the cases finding that there was probable cause.

MR. GILLHAM: That is true. But I think for us to fall under the sway of Rooker-Feldman, it does need to be a final appealable order, is my understanding. And if that's the case --

THE COURT: I don't think it has to be appealable, but the litigation has to have terminated before you come to federal court for Rooker-Feldman to apply.

MR. GILLHAM: Well, if that's -- if I'm wrong on that, I am wrong on that. In any event --

THE COURT: The Rooker-Feldman doctrine is different from issue preclusion or collateral estoppel. It's basically a prohibition on federal courts serving as appellate courts for state court decisions, and where you have a claim that is inextricably intertwined with an issue that was decided by federal court -- I mean by a state court and you can't find in favor of the plaintiff without concluding that the state court judgment was wrong, then that's when the Rooker-Feldman doctrine

applies. But it would only apply to your claim that the children were seized without probable cause. It wouldn't apply -- I've never said that it would apply to your other claims.

MR. GILLHAM: No, you did not say that it would -- they're arguing that, of course, but you have not said that it would apply to procedural due-process issues.

THE COURT: right.

MR. GILLHAM: But in any event -- and, you know, I suppose -- you know, if I'm wrong that it does not have to be a final appealable order for Rooker-Feldman to apply, then --

THE COURT: It doesn't have to be appealable.

MR. GILLHAM: Okay.

THE COURT: As I understand it -- and I could be wrong too. And you've persuaded me before that I was wrong, and you'll remember that you have. So I can be wrong too.

MR. GILLHAM: Yeah.

THE COURT: But my understanding of it is that it does not have to be an appealable order, but the litigation has to have concluded.

MR. GILLHAM: Yes, sir.

THE COURT: It has to be over before it comes to federal court.

MR. GILLHAM: All right. Well, in any event -- and our other argument on that issue would be contained in the

motion to alter and amend which is just, because of the nature of juvenile proceedings, which is that they are fast and there's -- that there's really not an opportunity to be fully heard.

But in any event, now, going on to the third issue, which is this issue of qualified immunity, my impression of the order was that the reason for the difference in results between Ms. Smith and Ms. Houck -- I'm not sure how you say her name -- was that Ms. Smith waited seven days before she filed to commence ex parte proceedings, and Ms. Houck waited two days and then filed a motion to -- you know, to get an ex parte order, and then the hearing occurred, I think, at about -- was finished about 12 days after the initial seizure and started around eight days.

And the Court's ruling there seemed to be that because she had started the proceeding on February 2nd that that would be a basis for granting qualified immunity.

And there I disagree with the result because I think that the Eighth Circuit cases at issue, which are Swipies and -- Swipies v. Kafka and another one, Berman, Brown, Jordan that we cited, as well as Hayes v. Faulkner County, is that the issue is not when the judicial proceedings were instituted but when the hearing occurred.

THE COURT: I went back and looked at your complaint, and you didn't allege that their fault was in delaying to

institute the proceedings. You alleged all along that the problem was the delay in getting a hearing.

MR. GILLHAM: Yes, sir. And, you know, truth be told with Ms. Smith, I think part of the issue was a delay of proceedings as well. I mean, she did wait too long. But I think ultimately what's really important is: When does the hearing occur? does it occur timely, or does it not occur timely?

And I think that case workers --

THE COURT: What were they supposed to do? What were Ms. Smith and Ms. Houck supposed to do?

After they have -- after they have filled out their affidavit, given it to the DHS lawyer and say, here, go initiate proceedings, the proceedings are initiated, the judge doesn't set a hearing or continues the hearing, what were they supposed to do?

MR. GILLHAM: Well, I think that they should have contacted the judge's office and said, Judge, this is unconstitutional; you cannot delay this hearing, and we object to it.

And I think that they are obliged to do that because, in a situation like this, where you have ex parte seizure of children going on, that you -- the burden on them is effectively that, if something like that happens, they need to be in contact with the Court, saying, look, you must get this done; you've got to have

this hearing in a timely manner; it's unconstitutional otherwise.

I don't think they can just sit there on their hands and say, oh, well, the judge said it's so, because that would effectively provide a get-out-of-jail-free card.

You know, it's --

THE COURT: In your reply brief -- and I'm looking at Page 9 -- you say, Plaintiff's due process claims are for delay of a probable cause hearing which has nothing to do with any judgment. Rather, the delay in the hearing increased the time that the plaintiffs were separated from each other. Given that the children may not return -- may not be returned until the PC hearing occurred, there are deprivation of rights and damages resulting.

Explain to me what you mean in that passage. It's on Page 9 of the Document 55 filed on May 22.

MR. GILLHAM: Okay.

THE COURT: It's near the bottom, last part of the last full paragraph.

MR. GILLHAM: Last full paragraph?

THE COURT: Yeah.

MR. GILLHAM: Well, part of that was a reference back to it appears that the defendants are arguing that Rooker-Feldman should apply to the length of time it took to have a hearing. So part of that is in reference to that issue.

Now, part of it is just that, you know, it's not just the parents' rights that are at issue here and it's not the parents alone who are apart. It's the children as well because, you know, when children are separated for 10, 12, 30 days from their parents and they don't know if and when they are coming back and they are put in the care of complete strangers who don't know them, you know, that, for a child, is, without question, horrible.

And if the State has taken these children -- and they have -- then they have got an obligation to move heaven and earth to get these hearings held. They cannot -- because your ruling, the way it stands, sir, is to me -- the difference is -- right now is two days versus seven days and when the process was started.

If you had a situation where Ms. Smith had started the process in two days and the hearings kept just getting bumped and bumped and bumped and bumped for 28 days like they did in Smith -- the Webb v. Smith case, she would get off, just like Ms. Houck did, and she could just sit there and say, oh, well, the judge said, you know, no big deal.

I think, if the State has taken custody of these kids, that they have got an obligation to make sure that these constitutional rights of the children and of the parents are observed because they are the ones who took the kids without an order from a court.

THE COURT: Part of what you said here is the children may not be returned until after the probable cause hearing. I take it -- and I look back -- that made me look back at the statutes and the procedure here, that once the judge has entered the emergency order authorizing the children to be taken into protective customer, then DHS is not allowed to return them until they have the hearing. Is that right?

MR. GILLHAM: I think they would be acting in contra- -- well --

THE COURT: You haven't argued that they were supposed to return them, and here you seem to say explicitly they couldn't return them, and that's what I was trying to get at.

MR. GILLHAM: Well, I think -- could they return them? One thing I am sure that they could do is I'm sure that, instead of sitting there -- I mean, the only basis that they had listed for taking my client -- Ms. Webb's children was that she was in jail. They had no other basis for doing it.

That was not true. They knew it was not true. They knew it was not true when they filed the petition. They knew it was not true every day for the next, I think, 21 days that they held those children through continuance after continuance.

I think they could have filed something with the Court saying, look, the only basis that we took these children on was that she was in jail, and she's not been in jail. She wasn't in jail when we filed the petition. This is something that we need

to correct.

And I think you can -- you know, if I was somebody who was responsible for taking kids under false pretenses, I think you can walk down to that judge's office and get him to sign an order.

So I think that regardless -- the first thing I would say is that, regardless of whether or not they could just give the kids back once an order is entered, I think they were well within their power and ability to get down there and get that order undone immediately and tell them they had the kids under false pretenses.

Now, whether or not they could just give the kids back when there's an ex parte order giving them custody -- and that I'm not sure about. I kind of think probably not, but I don't actually know.

THE COURT: It looks to me, from looking at the statute and at least reading what you've argued, if the -- DHS takes the child without an order in an emergency situation, they have 72 hours, and in that 72 hours, they could say, whoops, give the kids back.

MR. GILLHAM: Yes, sir.

THE COURT: Once the judge has entered an order giving them custody, they need another order, an order to divest themselves of custody. Would that be probably a correct statement?

MR. GILLHAM: Well, I'm not sure about that. I guess that's my answer on that, is that I would actually have to research that because it's not something I really thought about in that sense.

THE COURT: Well, it was my -- my attention was focused on that issue, partly because of what you said here, and you said, given that the children may not be returned until the PC hearing occurred, then I -- that kind of focused me on that question.

MR. GILLHAM: Yeah. When I wrote that, I think what I was probably saying was that -- when I said "may not be," meaning they just -- they may not get back to the kids until -- to the parents until you have the hearing. Now, that doesn't necessarily mean that they could not be because the Court has to order it.

And that could be -- that well could be right. It wouldn't shock me at all. I just haven't researched it.

THE COURT: Here -- this hasn't been briefed, but it's a question that is in my mind, and I want you to address it, if you can. And that is that, you know, your argument and your contention as to what was not done correctly was -- has to do with getting a hearing, and you're talking about walking down to the judge's office and getting an order and so forth and so on.

Are you asking that the burden be put on Ms. Smith and Ms. Houck to practice law?

I mean, isn't that something that the lawyers do?

MR. GILLHAM: I think the burden is on Ms. Houck or Ms. Smith and on DHS. Once again, they have taken the kids. DHS has lawyers that can file things for them. If they have taken children under false pretense and they know it, I think they have an obligation to correct that.

If they have taken children --

THE COURT: Well --

MR. GILLHAM: -- and hearings are not getting set in a timely manner, then they have an obligation to let the -- to let their lawyers know if something needs to go to court through a lawyer or to go to court directly, which they appear to have done. I mean, she filed -- did the affidavit.

I think they have an obligation to object and get a hearing set. And, regardless, Judge, I mean, the reality is that, you know, in Hayes v. Faulkner County, the jailers were still held liable, and they are not lawyers. In Whisman v. Rinehart, in Swipies v. Kafka, case workers who were not lawyers were held liable because there was not a timely hearing, and so the burden is on them. It's on them per Eighth Circuit case law, and it's on them in other cases from other circuits as well.

THE COURT: Were they held individually liable?

MR. GILLHAM: That's my understanding, yes, sir, in Whisman and -- well, let me put it this way: Those were appellate cases, and some were probably up on qualified immunity

appeals. Some were probably up there after a verdict. And so some of them may have been ultimately held individually liable, which is the case in Hayes v. Faulkner County. Some of them may have been back up on a qualified immunity appeal and gone back down, and I wouldn't necessarily know what happened after that.

THE COURT: When -- it looked like Ms. Smith signed her affidavit on June 30, and then the lawyer didn't file the petition with it attached until July 5th. What else was she supposed to do other than get her affidavit signed and get it to the lawyer?

MR. GILLHAM: Get it to the lawyer and make sure that he -- I mean, if she's the client, she can make sure the lawyer understands that it needs to get filed immediately. If she's the -- she's the one who has taken custody of those kids and has taken control of those kids, just like -- I mean, that's, to me, no different than saying, well, how can the jailers control the prosecutor's office. It's not even -- unlike DHS, where it's going to be DHS lawyers and DHS case worker, in the case like Hayes v. Faulkner County, Arkansas, you have got a situation where it's a jailer and then you have got a prosecutor and a court. And the problem is that the jailer is a county employee of the sheriff. The prosecutor may be elected at a county level, but ultimately he is a state employee. So it's not even the same level or branch of government, yet the jailer is being held responsible.

And the same has been the case, like I said, in Whisman, in Kafka, and Brown, Berman, and Jordan. You know, case worker after case worker has been liable in the Eighth Circuit, the Third Circuit, Seventh Circuit, Fourth Circuit.

So I just -- you know, I think she has an obligation to make sure that the lawyers are acting in a timely manner. I mean, she's the client effectively. If that's the case, then she's held responsible for the actions of her lawyer.

And I think that's especially true where she submitted a false affidavit.

Whisman v. Rinehart was an appeal of a denial of qualified immunity by Rinehart, Pursley, Cox, Blair, and Jines. Pursley was a social worker for the division of family services. Rinehart was a chief deputy juvenile officer. They conducted the initial seizure. Jines was the chief juvenile officer, supervising and approving Rinehart's action in taking control of the child. Fox and Blair were supervisory officials. I mean, none of these individuals were lawyers, it doesn't appear.

And it says, even if defendants had a right to take temporary custody of Joel, defendants had a corresponding obligation to afford Michelle and Joel an adequate post-deprivation hearing.

You know, it says, the fact that other remedies may have been available to plaintiffs to secure their constitutional rights to a post-deprivation hearing does not relieve defendants

of their obligation to provide such a hearing. Of even more concern is the failure to provide Joel his right to prompt post-deprivation hearing. He was clearly not in a position to secure that right for himself. So he's the child.

In Swipies v. Kafka, it was a deputy that was held liable because the hearing occurred 17 days after removal. Once again, that's not a lawyer.

So, you know, I think what it comes down to is, when you're the state and you have a truly awesome amount of power, you know, to break up, potentially destroy a family, and you take a child without a prior court order in an ex parte proceeding, then that puts a pretty high onus on you to make sure that hearing occurs in a prompt manner, that notice and a hearing, opportunity to be heard, occur in a prompt manner.

Otherwise, you know, I mean -- otherwise the state is going to be able to take children for up to a month or more, not insist that hearings be held, not make objections to violation of the children's constitutional rights, who they are supposed to be trying to protect, and let that go on for 30 days, let all the damage that occurs during that 30-day period just happen and just say, well, the judge said -- you know, the judge said continue the case.

We don't accept that for criminal defendants. I mean, that's not acceptable in a case of criminal defendants. It's surely not acceptable in the case of children who haven't done

anything.

You know, I remember back in the '80s, when I was a kid, hearing on the news that they had done a study of, you know, what kids were more afraid of, which was nuclear --

THE COURT: What kids were what?

MR. GILLHAM: What kids were more afraid of, nuclear war or the loss of their parents, and the answer was the loss of their parents.

You know -- you know, it's hard to see your kid go away for a week to a summer camp. You know, you'll miss them then, and they'll miss you then, and that's not a situation where they were ripped away suddenly with no explanation and held indeterminately with no good answer to those children when you're going back to see your parents, why you're being held against your will, why you're being ripped away from not just your parents but your cousins, your grandparents, your friends, your school, everything they know, and just hold them up for 30 days and just, you know, if the judge says continue it, just don't object, just let it roll because you're DHS. If you can't get sued over it, you've got no pressure to do anything. This will keep happening. I mean, this is not unusual, what's going on with this, and that just can't be the law, that you can take people's children for 30 days and just let it roll because, hey, no big deal, it's not my kid, I don't need to correct that false affidavit, I don't -- you know, I've only got the kids because

she's in jail and she's not in jail anymore and I'm not going to bother to object to a hearing. That's not the law anyway, not under Swipies, not under Hayes v. Faulkner County, not under Berman, Brown.

You know, they haven't cited a case that says -- I mean, let me put it this way: I've cited about five or six cases that show that case workers can be held liable for doing exactly what occurred here both in the Lay case and the Webb case.

They don't have any cases at all saying that you can take a kid, not ensure that there won't be a hearing inside of, you know, the 72 hours and we are not responsible for it. There's not one single case that they've cited that says that, that that's okay, that they can get away with it.

They cited the Manzano case, and that's not the same kind of case at all. It has nothing to do with what we are doing here. But they don't have a single case that says they can do what they did in terms of letting these hearings drag out for 8, 10, 12, 30 days.

THE COURT: yeah.

MR. GILLHAM: Thank you, sir.

THE COURT: Thank you.

MS. JACKSON: Thank you, your Honor. I'm Maryna Jackson. I work for the Arkansas Attorney General's Office. I represent defendants in this case. May it please the Court.

THE COURT: Proceed.

MS. JACKSON: Thank you, your Honor.

In this case plaintiff filed their original complaint. We filed motion to dismiss their original complaint. They attempted to amend complaint once. We filed another motion to dismiss. The Court ruled on our motion to dismiss and dismissed majority of the plaintiff's allegations in this case. And then plaintiff yet attempted to file another complaint, slightly changing allegation in this case. We agreed with the Court ruling on the motion to dismiss, however, after the Court ruled, we were in receipt of the original pleadings in the juvenile court cases that we filed with the Court under seal, and our concern, your Honor, was that, when we look at those pleadings in the original juvenile case proceedings, just simple review of those pleadings showed that the facts as alleged in the complaint do not state that -- the same facts that happened in the juvenile court cases, and this is why we moved to reconsider because we were in receipt of those pleadings in the original juvenile court proceedings. For example, the entire case and allegation in plaintiff complaint is based on their allegation that Defendant Smith lied in her affidavit and she submitted false affidavit stating that plaintiff was incarcerated. That's not true.

The simple review of that affidavit shows that there is no false allegations in her affidavit, at least known that they could point out in the complaint or allege that she's falsified

in her complaint. For example, in Smith case, it was not the situation where DHS just seized children from the parents. In fact, in the Smith case, mother was involved with DHS since 2010 and received various different services such as drug treatment, parenting classes, visitation, transportation, home visits. And finally, even according to the transcript from the hearing, there was an allegation of educational neglect when mother simply did not take child to school, and the judge at that hearing ordered mother to be incarcerated and ordered DHS worker to take custody of the children.

So this was not the situation where DHS worker took children from the parent. This was at the court hearing. Mother was there at the court hearing. They attempted to find another replacement for children, but relatives that were available and present in that hearing refused to complete a urine sample, and there was simply no appropriate relative or friend who could take children at the hearing, and this is why DHS ended up with the custody of these children.

So after this happened, the case worker, who is a party in this case, filed her affidavit, and so far even though complaint says that she submitted false affidavit, the only false statement that they allege that she stated in her affidavit was that the mother was incarcerated at the time when Chelsea Smith signed her affidavit.

Well, it's simply not true because Ms. Smith signed her

affidavit on June 30th, 2017, when mother was, in fact, in prison, in jail, incarcerated. So they could not allege any false statement that this DHS worker stated in her affidavit.

Furthermore, the review of the pleadings that are filed in the juvenile court proceedings show that Ms. Smith -- and she is defendant in this case individually and in an official capacity. She did not sign a single pleadings in this case. She did not cause any pleadings to be filed. The pleadings were handled on behalf of DHS by their attorney, and as far as Ms. Smith, the order showed that she was not even present at some of those hearings that they allege she caused to happen.

There are probable cause orders in both cases with respect to Ms. Smith and Houck. Both of the probable cause orders found that there was probable cause to remove children from the parents' custody. There was no dispute about that.

Both of the plaintiffs were present in that hearing. Both of the plaintiffs had counsel who represented them during the juvenile court proceeding, and I believe it's the same counsel who is the counsel here.

And the courts in those juvenile cases held that, whenever hearings were extended, they were extended and continued for several reasons during those juvenile court cases. Some of those reasons included the request of plaintiff themselves. For example, there was testimony and -- not testimony. There was a pleadings in juvenile court cases where Ms. Smith showed up at

the hearing and refused to have an attorney be appointed to her and told the judge that she already talked to counsel, and the hearing was continued because of that.

So plaintiff's allegation that the children were held for this incredible amount of days were not even caused by defendant actions, and they could not have been caused by defendant actions. Some of those hearings were continued at the request of plaintiff who were represented by counsel, those cases. There were orders, your Honor, from the juvenile court that said that good cause shown for continuance of the hearing, and the plaintiffs in those cases, they did not object.

This was the circuit court judge finding that there was a good cause at that time, findings of the judge who was familiar with specific factual allegations in those cases who found that at that time it was necessary to continue hearings in that case and to hold the children.

With respect to Lay, the pleadings that were filed in Lay case as well, in that case this is not the situation where plaintiff allege that children were seized. In fact, the affidavit of case worker shows that mother basically gave children to DHS workers and said that "You can just take them; I don't care at this time."

So this was not the situation where children were seized by DHS. This was a situation where DHS had to take children into custody. And that's not what complaint alleges, but this is

what the pleadings in juvenile case clearly show.

Furthermore, in the Lay case that the Court find the children were released after plaintiff complied with several conditions, and those conditions were ordered by the Court at the probable cause hearing. DHS and attorney ad litem, who actually postponed release of the children in Lay case, wanted to make sure that those conditions were complied. There was some allegation of sexual abuse on behalf of children with respect to their father, and there are some very strict and severe condition that the parents had to comply before children were released.

And several of those hearings were continued for good cause, and it was shown that probable cause existed to detain children into DHS custody, and DHS could not even release children to the parents because there was orders of the court for emergency custody, enough that the trial judge entered the order for DHS to take children into the custody.

The DHS has to comply with the order, and there was attorney ad litem were involved in both of the cases.

So the Court has dismissed complaint under Rooker-Feldman doctrine, and I would like to clarify. There were some argument about whether there was a final order in the underlying juvenile cases.

For the purposes of Rooker-Feldman doctrine, the proceedings in the state court, they were complete, and that is

the only standard that is required for the Rooker-Feldman doctrine.

Yes, an ex parte order for emergency custody is not a final appealable order under Arkansas Supreme Court; however, there were probable cause orders in both cases, and in both cases, the cases were dismissed at the very end. And plaintiffs in this case did not raise any objections to timeliness of the proceedings; they did not raise any objection to the Court orders, stating that those hearings were extended for good cause.

The juvenile court entered its education order in Webbs case last year, and I believe, if we'll look at the pleadings in Webb case, some of the proceedings going on to August and October of 2017 when the case was actually dismissed.

In the case that it is dismissed, it does not state whether it was dismissed with prejudice or without prejudice; so we have to assume that they were dismissed without prejudice and could be brought back within a year. But there was adjudication order in both cases, and the plaintiffs did not file any appeals; they did not raise any objections to dismissal of the case.

They could file some motions in those cases objecting to timeliness of the proceedings. They could file some objections to orders -- findings of probable cause. They did not do that. Therefore, they waive their right to reargue this in federal court.

I believe, your Honor, they cannot go to state court, litigate this case for over a year, be silent about any objection as to timeliness of the proceedings, anything like that. They did not argue that the probable cause orders were wrong. They, in fact, agreed to comply with those strict conditions in Lay case, and they did not object to probable cause in Smith case, and they did not raise any objections to the affidavit that were filed in that case and then a year later go to federal court and try to reargue the same case without even having this Court having opportunity to look at the factual allegation in that case, what actually happened in that case, and misstating what happened in the trial-court level in those juvenile cases.

One of the arguments that they are raising, your Honor, they are saying that potentially there -- as a result of defendant action, there may be some chilling effect in repetitive presence of Smith -- children -- and repetitive visits from DHS.

Well, this allegation is plausible because, as evidenced from that juvenile pleadings in the state court case, Ms. Webb was involved with DHS since 2010, 2009. She had repeated visits, and there was supervision for drug use of meth from DHS in 2009, and she received repeated services from DHS.

So this is not the family that never had any interactions with DHS until that juvenile court hearing in 2017.

And the transcript of the trial that was attached to plaintiff's original complaint clearly show that the trial court offer Ms. Webb many opportunities to not be incarcerated, to present evidence to show to take children to school, many, many opportunities, and the final -- the final hearing when she showed up at the hearing late, and that's when the judge ordered her to be incarcerated. So that's not even -- Ms. Smith could not cause that. Plaintiff herself caused that.

We submitted extensive briefs in this case on governmental immunity and immunity of case workers who are kind of like similar as Ms. Smith and Stacy Houck, in this case.

And the law is very clear that -- the Manzano case that we cited, for example, your Honor, the DHS should be able to investigate in child maltreatment situations just like the situation in this case, and typically the case worker and case investigators who actually go on the ground and conduct these investigations, they are immune under governmental immunity from liability, similar as plaintiff alleges here in this case.

It is clear from the pleadings in the underlying cases that the involvement of the case workers ended by them submitting affidavit, and that affidavit states very specific factual allegations with respect to plaintiffs.

And there's plaintiff cases that says, in similar situations, they should be immune. For example, in Burns v. Reed, 500 U.S. 478, the Supreme Court affirmed a ruling that a

state prosecutor was absolutely immune from liability for damages under 1983 for participating in probable cause hearing; Myers, 810 Federal 2D 1437, where minor children and guardians filed 1983 actions against Pierce -- state and county prosecutors, therapists, and law enforcement.

The district court in those cases found that, based on statement of some of the child victims, law enforcement officer had reasons to believe that evidence of abuse existed.

When government officials believe -- have reasonable belief that children are in danger and they act on those beliefs, those government officials should be immune under governmental immunity.

And in this case, the same should be applicable to defendants here. Even if Smith was responsible for removing children in this case, which she was not, the complaint states "facts which give rise to reasonable suspicion of educational neglect," and that just makes her a witness in the case, and she should be protected under government immunity.

The cases that are cited by plaintiffs in this case are clearly distinguishable. For example, they relied on Hayes, and Hayes is very different case than this one.

In Hayes, the Court said that the due process clause forbids an extended detention without a first appearance following arrest by warrant.

First of all, in the Hayes case where the detainee was held

without giving proper first hearing, he raised that argument in his state court case, which did not happen here.

Hayes is actually -- in Hayes case, the plaintiff argued that the county policy was to submit names of confinees to the Court and then wait for the Court to schedule a hearing.

There is no allegation in this case that Smith or DHS had a policy to submit some names to the juvenile court and they wait for hearing. In fact, the pleadings in this case, they demonstrate that Smith actually tried to communicate with plaintiff, tried to tell her in a text message -- that she said to plaintiff Webb in this case. She said that the judge reschedules the hearing.

She fulfilled her duty on June 30th when she submitted truthful affidavit that said that on June 30th the plaintiff was incarcerated. There's no evidence in this case or in juvenile court proceeding that Smith was required to do anything else or that she was responsible for schedule hearing or that she did not schedule hearing promptly.

She was not filing pleadings in that case. She did not appear at a lot of hearings that were -- that happened in that case. She simply was not a proper party to bring this allegation against her.

She was simply case worker, and her knowledge of the facts in this case, even based on her affidavit, is limited to factual allegations against children and not to any procedural steps in

the underlying juvenile cases.

Now, the Kafka case is different because in Kafka, first of all, the case was based on very different allegation. There was a noncustodial parent who lost two visitations with his daughter. And in Kafka the statute required a police officer who removes the child to inform the juvenile court of the removal emergency so the Court can make arrangements for the child welfare. There was no obligation here -- there's no obligation that places that duty on Smith or any other DHS investigator and case worker.

Your Honor, I believe that's the majority of our argument that we argued in our brief. If the Court has any specific --

THE COURT: Thank you, Ms. Jackson.

MS. JACKSON: Thank you.

MR. GILLHAM: They keep arguing that my clients didn't raise objections to the timing of the hearing. The problem with that is that my clients never got to have a hearing until -- I mean, you can't sit there and argue that they waived their objections when they still haven't received notice and an opportunity to be heard. I mean, my client -- you know, there's a text, as part of the body of the complaint, where Ms. Webb is asking about seeing her children, and she gets a text from the case worker that says, hey, the judge canceled the hearing for today.

How is she supposed to object to that? You know, she's not

a lawyer. She hasn't had an opportunity to get a lawyer. She's not being served with the pleadings. She's getting a text from a case worker.

Now, this is a case worker who at this point knew what her affidavit was, which is that DHS needs to keep custody of these children because she's been placed in jail and she's texting my client. So she clearly knew that my client was no longer in jail.

THE COURT: I've read the affidavit, and it says that your client refused to take a drug test and that they had no alternative but to keep the children pending some sort of hearing because they couldn't determine if she was on drugs. It's not just that she was in jail.

MR. GILLHAM: Well, in any event, she still has to have -- she's clearly involved in that process. She clearly knows what's going on, that there's an ongoing case. It's not something that she's just forgotten about. And, you know, regardless -- you know, my clients did object to the delays in hearing. They definitely objected in the Lay case because Mr. Churchwell was there acting as a lawyer and objecting to it.

Now, if you look at this Wiseman [sic] case --

THE COURT: Which one?

MR. GILLHAM: It says --

THE COURT: Which --

MR. GILLHAM: I mean, this is a quote. Whisman or

Wiseman.

THE COURT: Whisman v. Reinhardt?

MR. GILLHAM: Right. Yeah. I go back and forth on that because I don't know how to pronounce.

But it says that, even if defendants had a right to take temporary custody of Joel, defendants had a corresponding obligation to afford Michelle and Joel an adequate post-deprivation hearing, and those are people doing this type of social services work. It's Missouri, I think, instead of Arkansas.

But, you know, that's -- that's a direct quote from the Wiseman [sic] case. You know, they have an obligation to get this done. If they are going to take the children, they can't sit there and wash their hands of them and act like they don't know there's an issue. They have an obligation to get this done. If it needs to be a lawyer that files something, then they need to get on their lawyer and make sure he files something saying we object to extending this.

THE COURT: Right after the part that you quote it says, Defendant scheduled the hearing for March 15th, 1995, nearly a month after taking Joel into custody. Other defendants objected to an earlier hearing, claiming administrative convenience.

That certainly makes it sound like scheduling the hearing was in the defendant's control.

MR. GILLHAM: Well, they may have had some control. I don't know.

THE COURT: I don't know either.

MR. GILLHAM: But what it says is they have an obligation to afford Michelle and Joel an adequate post-deprivation hearing. If they have custody of these kids, if they are supposedly acting in their best interests, if they are taking custody of people without a court order or in the ex parte hearing after taking custody of them without a court order, then they have got an obligation to do everything they can to get a hearing, and they did not do that.

You know, they need to be objecting. If the Court starts continuing things on its own motion, then they need to be objecting to continuing that hearing, and they didn't do it. I mean, they are part and parcel to it. I mean, my client is getting a text from this case worker saying the judge canceled court for today. That's -- that's simply not discharging their obligations to the constitution, to the children, to the families. They may be under investigation by the State, but they are still citizens of the state.

If you're going to take their stuff, if you are going to take people, then you have got an obligation to make sure that you get a hearing done in a timely manner. And that's been the law in Swipies with the sheriff's deputy; it's been the law in Hayes with a jailer; it's been the law in Whisman with case

workers.

They have an obligation to get this done. They are the people that are holding the children or holding the inmates. You know, a deputy and jailer are prosecutors. They don't have the ability to necessarily control a court docket any more than -- like I said, with a case worker, at least it's their lawyer. There's a more attenuated relationship between a jailer or a deputy and a state-employed prosecutor than there is between a state worker who has state DHS lawyers that they work closely with on a regular bases, that they are the client of that lawyer. So I think they are responsible for the failure to get something done here.

THE COURT: These prison cases -- these jail cases, as I understand it -- and I know y'all have been involved in some of them here, but you have to take it to a magistrate. You have to take the detainee to a magistrate judge within a reasonable time. Maybe a district judge now in state court was called, and federal court, it's a magistrate judge, but same thing basically for our purposes.

And they are there. I mean, the jailer just has to take the detainee over to court and say, I have got somebody that we picked up last night or the night before and needs to have an initial appearance.

Not quite that simple with the kid that's been taken into protective custody because you have to give notice to the

parents and you have to set a date for a hearing, and there's more involved than just the initial appearance where you plead guilty or not guilty; do you have a lawyer? can you afford one? I mean, you're getting ready to put on evidence and proof and make arguments and litigate the merits of a claim, and so I am not sure that those two things are exactly the same.

MR. GILLHAM: They may not be the same, but on the other hand, in -- you know, there's the one Eighth Circuit case that says that, if seven days is too long to hold a car without a hearing, it's certainly too long to hold a child without a hearing.

THE COURT: That's not what it says. What it says is that, if seven days is too long to hold a car, 17 days is too long to have a child -- hold a child without a hearing, and so the holding there is that 17 days was too long. That's the holding.

MR. GILLHAM: Well, but on the other hand, you have Berman, you have Brown, you have cases where one I think says that 65 hours is the hour limit of -- of how long before you have a hearing. You've got another one that says it should be measured in hours and days, not in weeks, and Berman v. Young holds that a 72-hour delay in proceedings was rather outrageous; Brown v. Daniels, hours and days; Jordan v. Jackson, 65-hour delay in hearing was constitutionally permissible, but the 65-hour period was near, if not at, the outer limit of

permissible delay.

So, you know, probable cause is a relatively light burden. It's not like they are having to go do a full-on jury trial or even bench trial. They are taking the children from the -- from the parents. If they are doing that, they can give them notice of their right to a hearing right then, if they would, and, you know, they are going to have to come up with a way to get these cases heard. I mean, it's -- once again, you know, you have got Wiseman or Whisman, however you say it, holding case workers responsible. You've got the Eighth Circuit saying that 17 days is definitely too long, and I think that the indication is that seven days is too long.

What's more important, a car or a child? I think the child is far more important than a vehicle. I don't think that seven days is permissible. I mean, the children haven't even done anything, and they are being held for a month at a time, according to DHS training, practice, policy and procedure. I mean, there's nothing particularly unusual about what happened to Ms. Webb and her children.

So, in any event, there's a number of circuit courts of appeals that have said that basically 72 hours, for two of them. Another one that has said "not weeks; days and hours," which means at most I would say six days because seven days is a week. So I just -- you know, I think it's a clear requirement that they failed to meet that.

THE COURT: Okay. Thank you, Mr. Gillham. Thank you for the argument. We're adjourned.

(Proceedings adjourned at 2:41 p.m.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: September 20, 2018

/s/ Kathleen Maloney, RPR, FCRR
United States Court Reporter